IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

NO. 2:24-CV-2-FL

| | | |
|---|---|---|
| BLAGOMIR P. SHKODROV, Individually and as Personal Representative of the Estate of Stoyanka Dimitrova Shkodrova, Deceased; and PETRA D. FIST, as Personal Representative of the Estate of Stoyanka Dimitrova Shkodrova, Deceased | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| SUMMER CARMICHAEL, R.N.; LINDA SMITH, R.N.; JEFF PETER VISTA, M.D.; AARON HEIDE, M.D.; JAMES HEATON, M.D.; JENNIFER ALLEN, R.N.; SUSANJ PATEL, M.D.; EASTERN RADIOLOGISTS, INC.; SIMONE PATALINGHUG MONTOYA, M.D.; OUTER BANKS HEALTH, INC.; ECU HEALTH/EAST CARE, INC.; UNIVERSITY HEALTH SYSTEMS OF EASTERN CAROLINA, INC.; and CHESAPEAKE HOSPITAL AUTHORITY, INC.; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | ORDER |
| Defendants. | ) ) | |

This matter is before the court upon defendants' motions to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) (DE 104, 107, 109, 114). The issues raised have been briefed fully and in this posture the motions are ripe for ruling.

## STATEMENT OF THE CASE

Plaintiffs commenced this wrongful death, medical malpractice, and tort action, January 23, 2024, asserting claims pro se against medical providers and their employers arising out of

medical treatment of plaintiffs' mother, Stoyanka Dimitrova Shkodrova, deceased ("decedent"). Plaintiffs assert jurisdiction based upon diversity jurisdiction. In their operative 108-page amended complaint filed November 12, 2024,[1] they advance the following claims as personal representatives of decedent or individually:[2] 1) "wrongful death and survival"; 2) "medical malpractice and gross negligence"; 3) "reckless willful and wanton conduct"; 4) "civil obstruction of justice, fraud and conspiracy"; 5) "HIPAA and EMTALA[3] violations and violations of HIPAA-established and EMTALA-established duties"; 6) "intentional infliction of emotional distress"; and 7) "corporate negligence and negligent supervision." (Compl.[4] (DE 100) at 25, 55, 65, 67, 88, 99, 102). Plaintiffs seek damages, fees, and interest.

Defendants filed the instant motions to dismiss, asserting overlapping arguments in support of dismissal of all of plaintiffs' claims, including the inability of pro se plaintiffs to represent the estate of decedent, statute of limitations for the wrongful death claim and related claims, lack of a private right of action, and failure to allege sufficient facts supporting the tort claims.

---

[1]      In its order entered October 24, 2024, the court directed plaintiffs to file a corrected first amended complaint in accordance with the instructions therein, and the court terminated as moot plaintiffs' motions to amend as well as motions to dismiss filed by defendants concerning plaintiffs' original complaint. (DE 99 at 7-8). The court also addressed the issue of plaintiffs' pro se representation, noting "final determination at this juncture of plaintiffs' ability to proceed with pro se representation is premature because this determination depends in part upon the nature of plaintiffs' claims and the framing of the pleadings regarding those claims," (id. at 4), which the court now considers further in the instant order.

[2]      Plaintiff Blagomir P. Skodrov brings claims "individually and as personal representative the estate" of decedent; whereas plaintiff Petra D. Fist brings claims only "as personal representative of the estate" of decedent. (DE 1 at 1).

[3]      HIPAA is a reference to the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d et seq., and EMTALA is a reference to the Emergency Medical Treatment and Active Labor Act of 1986 (EMTALA), 42 U.S.C. § 1395dd.

[4]      Hereinafter, all references to the complaint in the text or "Compl." in citations are to the corrected first amended complaint, filed November 12, 2024. (DE 100).

Plaintiffs responded in opposition to the instant motions and two sets of defendants have filed replies.

## STATEMENT OF FACTS

The facts alleged in the complaint may be summarized as follows. Plaintiff Blagomir P. Shkodrov ("Shkodrov") brought his mother, decedent, to the Outer Banks Hospital, at Nags Head, North Carolina, on January 17, 2022, at approximately 8:30 p.m., allegedly "for a check-up related to [decedent's] abnormal heart rate, chest pain, weak left arm and somewhat weak left leg." (Compl. ¶ 21). Plantiff Petra D. Fist ("Fist"), "called the [Outer Banks Hospital] to explain [decedent's] symptoms, share that [decedent] has had a prior stroke about a year earlier, and inquire whether they had a stroke team in place," to which Outer Banks Hospital responded in the affirmative. (Id.). Decedent was "fully alert, fully responsive and fully able to communicate and/or render necessary consent." (Id. ¶ 22).

The emergency room at Outer Banks Hospital allegedly "admitted [decedent] at [8:46 p.m.] and called a Stroke Code at [8:47 p.m.]." (Id.). Defendant Summer Carmichael, R.N., ("Carmichael") performed a "partial stroke assessment." (Id.). Defendant Jeff Peter Vista, M.D. ("Vista") "requested a telemetry with [a] random neurologist," and defendant Aaron Heide, M.D. ("Heide") conducted a "neurological assessment" between 9:03 and 9:13 p.m. (Id. ¶ 23). At 9:13 p.m., defendant Heide recommended "thrombolysis . . . via intravenous administration of Altepase," also referenced in the complaint as "tPA." (Id. ¶ 24).

According to the complaint, "blood test results . . . were collected at [9:19 p.m.]" and a "single CT head scan which did not show any blood blockages/clots" was taken at [9:10 p.m.]." (Id. ¶ 22). Plaintiffs allege decedent "did not consent to a tPA administration," even though she was "fully alert and capable to comprehend language," and was communicating with Outer Banks

3

Hospital through plaintiff Shkodrov, given that decedent's "primary language was Bulgarian." (Id. ¶ 26).

At approximately 9:20 p.m., defendant Carmichael administered tPA to decedent and then "cleared her as 'good to go home.'" (Id. ¶ 27). Immediately after that clearance, however, decedent "collapsed and lost consciousness." (Id.). According to plaintiffs, "[i]t is nearly certain that [decedent] never regained consciousness." (Id. ¶ 28). Plaintiff Shkrodov was told to leave the room. Plaintiff Fist requested that decedent immediately be transferred to Norfolk General Hospital, but was told that Outer Banks Hospital "does not have helicopters." (Id.).

At 10:09 p.m., defendant Jennifer Allen, R.N. ("Allen") recorded a "comatose condition" for decedent. (Id. ¶ 29). Defendant Carmichael "stopped unilaterally" the tPA administration at either 10:10 or 10:15 p.m., with the exact time inconsistently specified in the medical records. Id. Defendant James Heaton, M.D., "performed a video-assisted intubation" of decedent, at either 10:15 or 10:32 p.m, again with the medical records providing inconsistent times. (Id. ¶ 30). "During the next few hours, [hospital] staff intrusively and painfully pumped [decedent] with massive amounts of painkillers, sedatives, paralyzing agents, blood pressure . . . medications," but medical records omit any communications between defendants at Outer Banks Hospital "regarding tPa reversal procedures or any other attempt to preclude . . . [d]ecedent's erupting brain hemorrhages." (Id.).

Outer Banks Hospital ultimately transferred decedent, via helicopter operated by defendant ECU Health/Eastcare, Inc., at approximately 1:25 a.m., the next day, January 18, 2022. (Id. ¶¶ 31, 106). There had been "an ambulance at the door of [Outer Banks Hospital] since about 9:00 p.m. January 17, 2022" available to transport decedent less than an hour in emergency transport to

4

Chesapeake Regional Medical Center, operated by defendant Chesapeake Hospital Authority. (Id.).

According to the complaint, medical records of defendants at Outer Banks Hospital falsely portrayed her condition as "stable" before and during the transfer, when in fact "her brain was rupturing, exploding for hours with hemorrhages, with infarcts advancing throughout her brain, unimpeded, unrestricted[,] with her heart under assault," and with her body "completely unresponsive." (Id. ¶ 32). Upon arrival at Chesapeake Regional Medical Center, decedent was placed "on a stretcher in the lobby due to lack of space." (Id.).

At 2:14 a.m. on January 18, 2022, an attending physician explained to plaintiff Fist "I don't know why she was transferred. There is nothing I can do for this woman. Her entire brain is flooded with blood. Get in your car and drive. She may not last until the morning." (Id. ¶ 33). A physician diagnosed decedent with coma, intercranial hemorrhage, and hemorrhagic cerebrovascular accident. (Id.). A diagnosis at 3:31 a.m. further detailed her "abysmal state." (Id.). She was "maintained in coma on the ventilator until January 21, 2022, when she died at about [5:47 p.m.] after being finally unplugged from the ventilator." (Id. ¶ 34). According to the complaint, Chesapeake Regional Medical Center "falsely indicated on [the] Death Certificate 'respiratory failure' (during the global pandemic COVID-19) as the immediate cause of her death." (Id.).

After decedent's death, defendants allegedly "provided false reports and/or refused to give to Plaintiffs [decedent's] full medical records and/or rendered partial files with omitted scans, tests, test results." (Id. ¶ 35). Records of "ECU/Ambulance EastCare" are "entirely missing." (Id.). Defendants at Outer Banks Hospital "have produced two divergent versions of the records," and

Chesapeake Regional Medical Center refused to provide "the records they received from" Outer Banks Hospital upon transfer of decedent.  (Id.).

Plaintiffs allege they made a "discovery more than 10 months later, of the extent of the [d]efendants' outrageously gross negligence and [d]efendants' reckless disregard of [decedent's] life, resulting in . . . her painful, numerous, simultaneous brain hemorrhages in multiple brain lobes."  (Id. ¶ 106).  "During more than 10 agonizing months, the Plaintiffs were precluded from knowing [decedent's] abysmal state at her discharge from the [Outer Banks Hospital] or at arrival at the [Chesapeake Regional Medical Center]: Plaintiffs received [decedent's] partial records from the CRMC on or about November 8, 2022 when they realized that [decedent] was in all probability brain-dead at the" Outer Banks Hospital.  (Id. ¶ 114).

### COURT'S DISCUSSION

A.      Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "Factual allegations must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.  In evaluating whether a claim is stated, the "court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments."

6

Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).[5]

B.      Analysis

1.      Wrongful Death and Related Claims

Defendants argue that plaintiffs' wrongful death claim is time barred, and that additional related claims are also time barred because they are subsumed within the wrongful death claim. The court agrees.

"North Carolina's wrongful death statute provides a remedy to the personal representative of a decedent's estate when the decedent would have otherwise been entitled to damages caused by another person's 'wrongful act, neglect[,] or default.'" Knibbs v. Momphard, 30 F.4th 200, 226–27 (4th Cir. 2022) (quoting N.C. Gen. Stat. § 28A–18–2(a)). "This statutory right supersedes all common law claims that could have been asserted." Id.; see, e.g., Bolick v. S. Ry. Co., 138 N.C. 370, 50 S.E.[6] 689, 689 (1905) (holding "action for personal injury could not be maintained after the death of the injured party unless the injury caused the death, in which case an action could be brought under" wrongful death statute); State Auto Ins. Co. v. Blind, 185 N.C. App. 707, 711, (2007) (holding "common law negligence action pursuant to North Carolina's survivorship statute, seeking recovery for [the decedent's] pain and suffering and medical expenses" was subsumed by wrongful death claim); see also N.C. Gen. Stat. § 28A-18-2(b) (setting forth "[d]amages recoverable for death by wrongful act," including "expenses for care, treatment and hospitalization incident to the injury resulting in death," "pain and suffering of the decedent," the "monetary value of the decedent," and "punitive damages").

---

[5]      Internal citations and quotation marks are omitted from all citations unless otherwise specified.

[6]      Because a pin-cite is available only in the Southeastern Reporter, the court cites to both the North Carolina Reporter and the Southeastern Reporter.

A two year statute of limitations applies to all wrongful death claims, accruing on "the date of death." N.C. Gen. Stat. § 1-53. This statute includes a cross-reference to N.C. Gen. Stat. § 1-15(c), which sets forth a "discover[y]" rule applicable to a "cause of action for malpractice arising out of the performance of or failure to perform professional services." N.C. Gen. Stat. § 1-15(c). Under this rule, "whenever there is bodily injury to the person . . . which originates under circumstances making the injury, loss, defect or damage not readily apparent to the claimant at the time of its origin, and the injury, loss, defect or damage is discovered or should reasonably be discovered by the claimant two or more years after the occurrence of the last act of the defendant giving rise to the cause of action, suit must be commenced within one year from the date discovery is made." N.C. Gen. Stat. § 1-15(c).

Here, plaintiffs' claim for "wrongful death" (Compl. (DE 100) at 25), is time barred due to the two year statute of limitations in N.C. Gen. Stat. § 1-53. Decedent allegedly died January 21, 2022, and plaintiffs filed their original complaint over two years later, on January 23, 2024. (See Original Compl. (DE 1) at 1). Under Rule 6(a)(1)(C), because January 21, 2024, fell on a Sunday, plaintiffs had until the end of the next business day, January 22, 2024, timely to file their action. Since they did not do so, their claim for wrongful death must be dismissed under the statute of limitations.

Additional common law claims by plaintiffs seeking relief for injuries "resulting in death" also must be dismissed because they are subsumed by the wrongful death statute. N.C. Gen. Stat. § 28A-18-2(b). These comprise plaintiffs' claims for "survival" (Compl. (DE 100) at 25); "medical malpractice and gross negligence" (id. at 55); "reckless willful and wanton conduct" (id. at 65); "HIPAA and EMTALA violations and violations of HIPAA-established and EMTALA-established duties" in that part allegedly resulting in death of decedent (id. at 88); 6) "intentional

infliction of emotional distress" as it relates to decedent's emotional distress (id. at 99; id. ¶ 113); and 7) "corporate negligence and negligent supervision," (id. at 102).

Plaintiffs' arguments in favor of an extension of the limitations period and against dismissal of the foregoing related claims are unavailing. Plaintiffs assert that under a "'discovery rule' accrual of a claim is delayed 'until the plaintiff has 'discovered' his cause of action." (Pls' Mem. (DE 120) at 10).[7] And they suggest that because defendants did not transmit some medical records "until as late as November 8, 2022," that is the date for accrual of their wrongful death claim. (Id.). That is not, however, the manner in which the discovery rule operates for wrongful death claims under North Carolina law. Rather, the discovery rule is triggered when "the injury, loss, defect or damage is discovered or should reasonably be discovered by the claimant two or more years after the occurrence of the last act of the defendant giving rise to the cause of action." N.C. Gen. Stat. § 1-15(c) (emphasis added). Accordingly, where a plaintiff discovers the "injury, loss, defect or damage" within two years, the plaintiff "may not avail herself of the extension of the filing period conferred as a result of latent injuries" under § 1-15(c). Conner v. St. Luke's Hosp., Inc., 996 F.2d 651, 653 (4th Cir. 1993).

Plaintiffs argue that because defendants allegedly engaged in fraud, civil obstruction of justice, and civil conspiracy, in falsifying, withholding, and altering decedent's medical records, then this should operate to extend statute of limitations for the wrongful death claim on the basis of the doctrines of equitable estoppel and equitable tolling. The court addresses these two doctrines in turn.

---

[7]    In those instances in which plaintiffs raise the same argument in their briefs in opposition to each of the motions to dismiss, as here, (see, e.g., Pls' Mem. (DE 118) at 10, Pls' Mem. (DE 119) at 15, Pls' Mem. (DE 121) at 8)), the court provides a citation to one of plaintiffs' briefs as an example.

Equitable estoppel requires "(1) lack of knowledge and the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party sought to be estopped; and (3) action based thereon of such a character as to change his position prejudicially." Hawkins v. M & J Fin. Corp., 238 N.C. 174, 178 (1953). To invoke equitable estoppel as a basis for avoiding a statute of limitations, a plaintiff must plead that a defendants' "intentional misconduct . . . cause[d] the plaintiff[s] to miss the filing deadline." Eng. v. Pabst Brewing Co., 828 F.2d 1047, 1049 (4th Cir. 1987); see Duke Univ. v. Stainback, 320 N.C. 337, 341 (1987). Here, plaintiffs do not allege conduct by defendants that caused plaintiffs to miss the filing deadline. Indeed, plaintiffs assert they were ready to file their complaint January 18, 2024, and they signed and dated their complaint January 20, 2024, but they were impeded by CM/ECF system rules from filing on those dates. (Pls' Mem. (DE 120) at 9; Original Compl. (DE 1) at 51).[8] Equitable estoppel thus does not apply because plaintiffs have not shown that defendants' "intentional misconduct . . . cause[d] the plaintiff[s] to miss the filing deadline." English, 828 F.2d at 1049.

As for equitable tolling, plaintiffs have not cited any basis under North Carolina law for applying this doctrine to the wrongful death statute of limitations. Plaintiffs cite to Merck & Co. v. Reynolds, 559 U.S. 633, 643 (2010); Holmberg v. Armbrecht, 327 U.S. 392, 397 (1946); and Bailey v. Glover, 88 U.S. 342, 348 (1874). However, these cases all set forth a "discovery" rule for federal claims "where a plaintiff has been injured by fraud." Merck, 559 U.S. at 643; Holmberg, 327 U.S. at 397; see Bailey, 88 U.S. at 348. Where the wrongful death statute already cross-references the specific discovery rule in N.C. Gen. Stat § 1-15(c), and this specific discovery

---

[8] To the extent plaintiffs rely upon CM/ECF system rules as a separate basis for equitable tolling, the argument is unavailing because the doctrine requires action on the part of a defendant, not a third party. See Eng. v. Pabst Brewing Co., 828 F.2d 1047, 1049 (4th Cir. 1987) ("[E]quitable tolling and equitable estoppel . . . are based primarily on the view that a defendant should not be permitted to escape liability by engaging in misconduct that prevents the plaintiff from filing his or her claim on time.").

10

rule does not provide relief, there is no basis for expanding North Carolina law based on the federal "discovery" rule for federal statutory claims.[9]

In any event, plaintiffs have not demonstrated that application of the equitable tolling rule plaintiffs urge should serve to avoid the statute of limitations for their wrongful death claim. "The purpose of the fraudulent concealment tolling doctrine is to prevent a defendant from 'concealing a fraud, or committing a fraud in a manner that it concealed itself until' the defendant 'could plead the statute of limitations to protect it.'" Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc., 71 F.3d 119, 122 (4th Cir. 1995) (quoting Bailey, 88 U.S. at 349). To prevail on an argument that fraudulent concealment tolls the statute of limitations, "the plaintiff must demonstrate, inter alia, that he failed to discover those facts within the statutory period." Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 324 (4th Cir. 2006) (quoting Supermarket, 71 F.3d at 122)) (first emphasis in original; second emphasis added). Here, by plaintiffs' own allegations, defendants provided to plaintiffs the medical records supporting their wrongful death claim November 8, 2022, (Compl. (DE 100) ¶¶ 106, 114), well "within the statutory period." Id. Likewise, plaintiffs have not alleged facts giving rise to an inference that defendants "conceal[ed] a fraud, or committ[ed] a fraud in a manner that it concealed itself until the defendant could plead the statute of limitations to protect it.'" Supermarket, 71 F.3d at 122 (emphasis added).[10] As such equitable tolling is not warranted.

---

[9]    For their part, defendants rely upon Friedland v. Gales, 131 N.C. App. 802, 807 (1998), for the proposition that "[f]raudulent concealment may also operate to toll the statute of limitations where all the elements may be shown." However, Friedland addressed "equitable estoppel" and not equitable tolling, id., and both of the cases it cited for this proposition did not find equitable tolling applicable. See Connor v. Schenck, 240 N.C. 794, 795 (1954); Stallings v. Gunter, 99 N.C.App. 710, 716 (1990). Therefore, there has been identified no North Carolina case law providing precedent for applying equitable tolling to a wrongful death claim in the manner plaintiffs urge.

[10]    In addition, and in the alternative, for the reasons set forth below, plaintiffs have not alleged facts satisfying all the elements of a claim for fraudulent concealment against defendants.

11

Plaintiffs also argue that the scope of the time-bar of their wrongful death claim, if any, should not extend to any of their other claims. Plaintiffs contend, for example, in their complaint that their "remedy for actual and punitive damages does not lie only in a wrongful death claim." (Compl. (DE 100) ¶ 72). They also argue that the wrongful death statute only "encompasses damages arising from one injury by one provider, rather than sequential injuries at the hands of 5 different providers." (Pls' Mem. (DE 120) at 9). This argument is without merit. In fact, the North Carolina wrongful death statute encompasses a wide range of damages, and is not limited to injuries caused by a single provider. It provides damages including "[e]xpenses for care, treatment and hospitalization incident to the injury resulting in death[;] compensation for pain and suffering of the decedent;" and "punitive damages for wrongfully causing the death of the decedent through malice or willful or wanton conduct." N.C. Gen. Stat. § 28A-18-2. Although both survivorship and wrongful death claims may be brought for injuries received by a decedent prior to death, where defendants' conduct causes injuries that in turn cause the decedent's death the survivorship action is moot and only a wrongful death claim may proceed. See Bolick, 138 N.C. 370, 50 S.E. at 690; Blind, 185 N.C. App. at 712–13. In the context presented here, plaintiffs' survivorship, medical malpractice, gross negligence, willful and wanton conduct, claims are subsumed under the wrongful death statute because the entire basis of the complaint is that defendants' alleged negligence, or willful and wanton conduct, resulted in decedent's death. Blind, 185 N.C. App. at 712; Alston, 177 N.C. App. at 340; see Knibbs, 30 F.4th at 226–27.

With respect to their claim for corporate negligence and negligent supervision, plaintiffs cite to Estate of Waters v. Jarman, 144 N.C. App. 98 (2001), for the proposition that "when a claim against a hospital 'arises out of policy, management, or administrative decisions,' it sounds in ordinary negligence." (Pls' Mem. (DE 120) at 2 (quoting Estate of Waters, 144 N.C. App. at 101-

12

102)).  Plaintiffs argue that corporate defendants in this case breached duties to "decedent and the plaintiffs arising out of their policy, management and administrative decisions," such as a duty to transfer decedent, duty to monitor physicians, and duty to develop "protocols or procedures for the safe administration of tPA."  (Id. at 2-3).  However, Estate of Waters has been superseded by statute as stated in Estate of Savino v. Charlotte-Mecklenburg Hosp. Auth., 375 N.C. 288, 296 (2020).  There, the court noted that since a 2011 amendment to N.C. Gen. Stat. § 90-21.11, "claims of administrative negligence against hospitals . . . that arise from the same facts and circumstances as a claim for furnishing or failing to furnish professional health services have been classified as medical malpractice suits."  Estate of Savino, 375 N.C. at 296.  The court expressly noted that "[p]rior to this amendment, such administrative or corporate negligence claims were often treated as ordinary negligence claims," citing Estate of Waters as an example.  Estate of Savino, 375 N.C. at 296.  Now, alleged "breach of administrative or corporate duties to the patient, including, but not limited to, allegations of negligent credentialing or negligent monitoring and supervision" must be treated as "professional services medical malpractice."  Id. at 295-96 (emphasis added).  Here, all the alleged breaches of duty by corporate defendants asserted in the complaint constitute such professional service allegedly causing the wrongful death of decedent.  (Compl. (DE 100) ¶¶ 116-19; see, e.g., Pls' Mem. (DE 118) at 3 (arguing claim based upon "fail[ure] to oversee and monitor" and "negligent supervision")).  Accordingly, plaintiffs' claims for corporate negligence and negligent supervision are subsumed into plaintiffs' wrongful death claim and must be dismissed on this basis.[11]

In sum, plaintiffs' wrongful death claim is dismissed as time barred, and the following claims also are dismissed as subsumed within the wrongful death claim: plaintiffs' claims for

---

[11]    The same analysis applies to plaintiffs' asserted breaches of HIPAA-established and EMTALA-established duties towards decedent by the corporate defendants, resulting in dismissal of that part of plaintiffs' HIPAA/EMTALA

13

"survival" (Compl. (DE 100) at 25); "medical malpractice and gross negligence" (Id. at 55); "reckless willful and wanton conduct" (Id. at 65); "HIPAA and EMTALA violations and violations of HIPAA-established and EMTALA-established duties" in that part allegedly resulting in death of decedent (Id. at 88); 6) "intentional infliction of emotional distress" as it relates to decedent's emotional distress (Id. at 99; Id. ¶ 113); and 7) "corporate negligence and negligent supervision," (Id. at 102).

     2.     Civil Obstruction of Justice, Fraud, and Civil Conspiracy

     Defendants argue that plaintiffs fail to allege sufficient facts establishing claims for civil obstruction of justice, fraud, and civil conspiracy. The court agrees.

     "Where . . . a party deliberately destroys, alters or creates a false document to subvert an adverse party's investigation of his right to seek a legal remedy, and injuries are pleaded and proven, a claim for the resulting increased costs of the investigation will lie." Henry v. Deen, 310 N.C. 75, 88 (1984). "The elements of fraud are (1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, and (5) resulting in damage to the injured party." Pearce v. Am. Def. Life Ins. Co., 316 N.C. 461, 468 (1986). A civil conspiracy is not an independent claim but rather involves an underlying "wrongful act resulting in injury to another committed by one or more of the conspirators pursuant to the common scheme and in furtherance of the objective." Henry, 310 N.C. at 87.

     Plaintiffs' claims for civil obstruction of justice, fraud, and civil conspiracy fail due to insufficient factual allegations supporting all the elements of these claims. Plaintiffs base these claims on the assertion that defendants "conspired to create false and misleading records of the

---

claim. The court addresses further herein that part of plaintiffs' HIPAA/EMTALA claim based upon direct violations of the statutes.

true facts concerning [decedent's] medical care" at Outer Banks Hospital. (Compl. (DE 100) ¶ 106). Plaintiffs further assert that defendants "engaged in . . . fraud in an attempt to preclude Plaintiffs from discovering their negligent acts." (Id. ¶ 97). Accepting for purposes of the instant analysis that defendants made false representations or concealment of facts in decedent's medical records,[12] plaintiffs have not alleged facts giving rise to an inference that they were in fact deceived by this conduct, nor that they were damaged.

With respect to their actual deception, plaintiffs allege that they made a "discovery more than 10 months [after decedent's death], of the extent of the [d]efendants' outrageously gross negligence and [d]efendants' reckless disregard of [decedent's] life, resulting in . . . her painful, numerous, simultaneous brain hemorrhages in multiple brain lobes." (Id. ¶ 106). "During more than 10 agonizing months, the Plaintiffs were precluded from knowing [decedent's] abysmal state at her discharge from the [Outer Banks Hospital] or at arrival at the [Chesapeake Regional Medical Center]: Plaintiffs received [decedent's] partial records from the CRMC on or about November 8, 2022 when they realized that [decedent] was in all probability brain-dead at the" Outer Banks Hospital. (Id. ¶ 114). As such, defendants in fact revealed their own alleged misstatements upon disclosure of additional medical records.

Furthermore, where plaintiffs received from defendants such additional medical records in November 2022, plaintiffs have not alleged that they were damaged by the delay in their receipt. For example, they do not allege, as was alleged in Henry, that they incurred "resulting increased costs of [a legal] investigation." 310 N.C. at 88. They also do not allege that they were precluded from completing their complaint as a result of the alleged misconduct by defendants, where they

---

[12]      For defendant Chesapeake Hospital Authority, Inc., plaintiffs do not plausibly allege enough facts to support an inference that it is responsible for the alleged insufficient recordkeeping at Outer Banks Hospital that is subject of the allegations at paragraphs 98-106 of the complaint. Accordingly, that part of plaintiffs' claims against defendant Chesapeake Hospital Authority, Inc., must be dismissed for this additional reason.

15

allegedly completed and signed their complaint January 20, 2024. (See Original Compl. (DE 1) at 51).

Plaintiffs contend they have a stated claim for "constructive fraud" based on the fact that decedent "was a patient of these Defendants [with whom] she had a dejure fiduciary relationship," and defendants breached this duty by rendering "deficient care and further engaged in fraud to conceal its abysmal failures." (Pls' Mem. (DE 120) at 6). A claim asserted by plaintiffs on this basis fails on multiple levels. First, plaintiffs must bring this claim in their representative capacity on behalf of the estate of the decedent, because it is dependent upon a physician-patient relationship. See Watts v. Cumberland Cnty. Hosp. Sys., Inc., 317 N.C. 110, 116 (1986). Plaintiffs, however, have not demonstrated based upon existing binding precedent that they may bring such a claim pro se. See Wojcicki v. SCANA/SCE&G, 947 F.3d 240, 246-47 (4th Cir. 2020) (recognizing "general rule that a person may not represent another person or entity pro se," including a prohibition on "a non-attorney administrator from vindicating her interest pro se" on behalf of an estate of a deceased person).[13]

Second, in the alternative, a common law constructive fraud claim brought on behalf of the estate of decedent, on the basis of rendering "deficient care and further engaged in fraud to conceal its abysmal failures," (Pls' Mem. (DE 120) at 6), is subsumed within plaintiffs' wrongful death claim. See Bolick, 138 N.C. 370, 50 S.E. at 690; Knibbs, 30 F.4th at 226–27; Blind, 185 N.C. App. at 712. Third, plaintiffs have not alleged facts giving rise to a plausible inference that defendants "have taken advantage of [a] position of trust to the hurt of [decedent]." Watts, 317

---

[13]    The court previously noted this rule may not apply to a wrongful death claim, and it may depend upon the "nature and scope of creditors' claims against the estate." (Order (DE 99) at 4). For purposes of the instant analysis, the court adheres to the prevailing circuit court precedent, which bars pro se representation of an estate "where the estate has outstanding creditors," without qualification. (Id.). Moreover, in the event any of plaintiffs' claims are not subsumed within plaintiffs' wrongful death claims, contrary to the court's analysis herein, then such claims similarly must be dismissed on the basis that plaintiffs cannot represent the estate of decedent pro se.

N.C. at 116. Plaintiffs assert that "[t]he advantages sought here include but are not limited to [defendants'] quest to insulate [themselves] from liability, to ensure . . . certifications, to maintain their reputations, to protect . . . from liability, loss of reputation, loss of credentials." (Pls' Mem. (DE 120) at 6). However, the complaint lacks any plausible link between these asserted advantages and the care of decedent in a physician patient relationship that resulted in her death.

Finally, lacking an underlying tort claim, plaintiffs' civil conspiracy claim necessarily fails. Henry, 310 N.C. at 87. In sum, plaintiffs' claims for civil obstruction of justice, fraud, and civil conspiracy must be dismissed for failure to state a claim upon which relief can be granted.

3.      Intentional Infliction of Emotional Distress

Defendants argue that plaintiffs fail to allege sufficient factual allegations meeting all the elements of a claim of intentional infliction of emotional distress.[14] The court agrees.

"Liability arises under this tort when a defendant's conduct exceeds all bounds usually tolerated by decent society and the conduct causes mental distress of a very serious kind." Dickens v. Puryear, 302 N.C. 437, 447 (1981). The elements of a claim of intentional infliction of emotional distress are thus "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress to another." Id. at 452. "A defendant is liable for this tort when he [i] desires to inflict severe emotional distress or [ii] knows that such distress is certain, or substantially certain, to result from his conduct or [iii] where he acts recklessly in deliberate disregard of a high degree of probability that the emotional distress will follow and the mental distress does in fact result." Id. at 449.

---

[14]      Plaintiffs suggest that they also bring a claim of intentional infliction of emotional distress on behalf of decedent. (See Compl. (DE 100) ¶ 113). However, as set forth previously, such a claim must be dismissed because it is subsumed within plaintiffs' wrongful death claim. See N.C. Gen. Stat. § 28A-18-2(b)(2) (providing wrongful death damages for "pain and suffering of the decedent"). Plaintiffs also suggest that they assert a claim based upon negligent infliction of emotional distress, which the court addresses in the analysis herein.

17

"[E]xtreme and outrageous conduct is that which exceeds all bounds of decency tolerated by society[,] and is regarded as atrocious, and utterly intolerable in a civilized community." Turner v. Thomas, 369 N.C. 419, 427 (2016).  North Carolina "has set a high threshold to satisfy this element." Id.  "Foreseeability of injury, while not an element of the tort, is a factor to consider in assessing the outrageousness of a defendant's conduct." Id. at 427-28.  "In this context, the term 'severe emotional distress' means any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 327 N.C. 283, 304, (1990).

In this case, plaintiffs fail to allege facts giving rise to a plausible inference of the elements of extreme and outrageous conduct and severe emotional distress.  In the complaint, plaintiffs assert that defendants engaged in extreme and outrageous conduct by "delaying [decedent's] transfer to a higher-level facility, while her brain was under attack so that Defendants can excise and/or falsify the records."  (Compl. (DE 100) ¶ 114).  They also assert that "[d]ecedent did not benefit from an orderly, contained admission," and "[d]ecedent became increasingly anxious and distressed, was terrified at the sight of the t-PA bottle and kept pulling away from the t-PA needle." (Id.).  These allegations regarding treatment of decedent, however, do not meet the "high standard" for showing extreme and outrageous conduct.  Turner, 369 N.C. at 427.

Plaintiffs also allege that "[a]fter their mother lost consciousness (she [w]as not simply asleep), [p]laintiff [Shkodrov] was kicked out in the lobby and prohibited from seeing his Mother until she was dragged to the helicopter pad after 1 am."  (Id.).  "Plaintiffs were left in the dark regarding their Mother's welfare after witnessing their Mother's sudden loss of consciousness."

(Id.).  "Plaintiff Shkodrov, marooned in the lobby, and Plaintiff Fist, impotently over the phone, begged for hours, waited for hours, and begged more in vain for any information about their Mother to no avail."  (Id.).  Plaintiff Shkodrov further witnessed "[d]efendants dragging away his Mother's listless body to the helicopter pad and talking to his Mother with her brain already gone after being falsely and cruelly prompted: 'Talk to her, she can hear you.'"  (Id.).  These allegations that are focused on plaintiffs' experiences during decedent's treatment and transfer, while more pertinent to a claim brought on their own behalf, do not rise to the standard of "conduct is that which exceeds all bounds of decency tolerated by society[,] and is regarded as atrocious, and utterly intolerable in a civilized community."  Turner, 369 N.C. at 427.

Plaintiffs also raise allegations about defendants' failure to release medical records and ultimate release of records on November 8, 2022, when plaintiffs "realized that their Mother was in all probability brain-dead at the" Outer Banks Hospital.  (Id.).  According to the complaint, "[p]laintiffs were in shock when they read the report and were able to see the scans of their Mother's obliterated brain upon her arrival at [Chesapeake Regional Medical Center]."  (Id.).  "Plaintiffs then realized that the [Chesapeake Regional Medical Center]-generated hopes that their Mother could be able to survive, even in a vegetative state, so that the Plaintiffs would agree to maintain their Mother on a mechanical ventilator, were only false hopes calculated to extend the date of their Mother's death so that to insulate [the hospitals'] corporate partners from liability."  (Id.).  These allegations regarding plaintiffs' shocked reaction to medical records, received ten months after decedent's death, also do not meet the "high threshold to satisfy this element."  Turner, 369 N.C. at 427.

Likewise, plaintiffs' have not alleged facts permitting an inference that defendants knew or should have known that "severe emotional distress" would follow from their alleged actions in

19

treating decedent. Dickens, 302 N.C. at 449. Plaintiffs allege that "[p]laintiff Shkodrov suffered severe mental harm, manifesting in nervous breakdown, chronic depression, anxiety, loss of sleep, loss of appetite, lack of concentration, guilty feelings, decreased energy levels, feeling alienated from loved ones, post-traumatic stress disorder and loss of teeth." (Compl. (DE 100) ¶ 114).[15] Apart from this conclusory allegation, however, plaintiffs do not allege facts permitting an inference that the alleged "conduct did in fact cause the plaintiff severe emotional distress" in the form of these asserted conditions. Johnson, 327 N.C. at 304. Impeding this inference under the circumstances of this case is the allegation that plaintiffs were "in shock" only after they "read the report and were able to see the scans" in November 2022. (Compl. (DE 100) ¶ 114).

Plaintiffs argue that North Carolina courts have "deemed a sufficiently alleged outrageous conduct under much lesser circumstances," (Pls' Mem. (DE 120) at 7), citing the facts of Turner, as well as Acosta v. Byrum, 180 N.C. App. 562, 564 (2006); and Griffin v. Mortier, 837 F. App'x 166, 168 (4th Cir. 2020).[16] These cases, however, all are instructively distinguishable on key facts. In Turner, investigative agents allegedly falsified reports and fabricated blood splatter tests in order to convict the plaintiff of first-degree murder, thus distinguished from the instant case because of the consequences this had on the plaintiff "standing trial for first-degree murder." 369 N.C. at 428. In Acosta, a psychiatrist allowed release of confidential medical records to an office manager who had "severe personal animus" for the plaintiff, and the court applied a lesser "notice" pleading standard not applicable in this court. 180 N.C. App. at 568-69. In Griffin, the court held the defendant nurse "acted in an 'extreme and outrageous' manner when she failed to examine or treat

---

[15]    Plaintiffs' failure to allege emotional or mental disorder on the part of plaintiff Fist is an additional, and alternative, basis for dismissing that part of plaintiffs' claim based upon plaintiff Fist.

[16]    A fourth case cited by plaintiffs, Groves v. Travelers Ins. Co., 139 N.C. App. 795, 796 (2000), not only has no precedential value because it was reversed, but also demonstrates that conduct not meeting the "extreme and outrageous" standard will not support such a claim. See Groves v. Travelers Ins. Co., 354 N.C. 206, 206 (2001).

20

[an inmate] after learning that he had suffered a seizure and struck his head," and instead of treating him "at all," placing him "in a holding cell – where he could apparently further injury himself – and that no medical action was taken when [the inmate] became increasingly disoriented while in the holding cell." 837 Fed. App'x at 173. <u>Griffin</u> thus is inapposite because it addressed a direct claim brought by the inmate, not a relative of the plaintiff, as here, and arose in the context of placement of the plaintiff in a jail holding cell rather than providing treatment.

Plaintiffs also argue that they have stated a claim for negligent infliction of emotional distress, on the basis that "[d]efendants were negligent in [their] policies, protocols, procedures, [and] its transfer and care of the Decedent, [their] failure to render the Decedent's complete and truthful records." (Pls' Mem. (DE 120) at 7-8). However, such a claim fails because plaintiffs fail to allege facts permitting a reasonable inference that "it was reasonably foreseeable that such conduct would cause the plaintiff[s] severe emotional distress," or that the "conduct did in fact cause the plaintiff severe emotional distress." <u>Johnson</u>, 327 N.C. at 304. Because of the difference in timing between what plaintiffs allegedly experienced at defendants' hospitals and the later receipt of allegedly revealing medical records in November 2022, the complaint lacks allegations establishing a causal link between the alleged negligence in defendants' conduct and the alleged symptoms experienced by plaintiff Shkodrov.

In sum, plaintiffs fail to state a claim for intentional or negligent infliction of emotional distress.

4.     EMTALA

Defendants argue that plaintiffs' EMTALA claim should be dismissed as time barred and for failure to state a claim upon which relief can be granted. The court agrees.

"Congress enacted EMTALA to address a growing concern with preventing 'patient dumping,' the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring them before emergency conditions were stabilized." Power v. Arlington Hosp. Ass'n, 42 F.3d 851, 856 (4th Cir. 1994). "EMTALA is not a substitute for state law malpractice actions, and was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence." Id.

EMTALA sets forth requirements for "an appropriate medical screening examination . . . to determine whether or not an emergency medical condition . . . exists," 42 U.S.C. § 1395dd(a), and "such further medical examination and such treatment as may be required to stabilize the medical condition, or . . . for transfer of the individual to another medical facility." Id. § 1395dd(b). EMTALA provides a private right of action to "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section," by "obtain[ing] those damages available for personal injury under the law of the State in which the hospital is located." Id. § 1395dd(d)(2)(A). However, "[n]o action may be brought under this paragraph more than two years after the date of the violation with respect to which the action is brought." Id. § 1395dd(d)(2)(C).

Plaintiffs' claims under EMTALA must be dismissed because they are time barred under the two-year limitations period, in the same manner that plaintiffs' wrongful death claims are time barred. In their EMTALA claim, plaintiffs allege, for example, failure to complete properly "EMTALA certification form[s]," "Memorandum of Transfer," or follow protocols for ensuring "timely transfer through adequate means to an adequate facility," all taking place before decedent's death. (Compl. (DE 100) at 90-94).[17] As such, "the violation with respect to which the action is

---

[17]    See Compl. (DE 100) ¶ 111. The court provides a page number citation in the text, because paragraph 111 spans multiple pages.

brought" took place more than two years prior to commencement of the instant case, 42 U.S.C. § 1395dd(d)(2)(C), and plaintiffs' EMTALA claim on this basis must be dismissed.

In addition, and in the alternative, for their EMTALA claim based upon failures to treat and transfer decedent and her medical records, prior to decedent's death, plaintiffs' EMTALA claim must be dismissed because plaintiffs cannot proceed on this claim pro se on behalf of the estate of decedent, for the reasons already stated with respect to plaintiffs' constructive fraud claim. Further in the alternative, plaintiffs do not allege facts permitting an inference of a substantive violation of the statutory requirements of EMTALA, particularly considering that "EMTALA is not a substitute for state law malpractice actions, and was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence," Power, 42 F.3d at 856, and considering that the facts alleged in support of plaintiffs' EMTALA claim are in substance the same as the grounds for plaintiffs' wrongful death claim.

Plaintiffs also suggest that they assert an EMTALA claim on their own behalf because of defendants' failure to transfer to them, personally, decedent's medical records properly or within a certain time period after decedent's death. (See, e.g., Compl. (DE 100) at 98 (alleging defendants "have flatly refused to provide the Decedent's complete medical records in violation of further EMTALA mandates and duties"). Plaintiffs, however, cite to no provision of EMTALA extending such a duty to plaintiffs, nor do plaintiffs allege facts that they have "suffer[ed] personal harm as a direct result of a participating hospital's violation of a requirement" of EMTALA in this manner. 42 U.S.C. § 1395dd(d)(2)(A).[18] Therefore, to the extent plaintiffs' assert an EMTALA claim

_____

[18]   Likewise, in that part where plaintiffs assert a claim based upon HIPAA, the claim must be dismissed because there is "no private right of action under HIPAA." Payne v. Taslimi, 998 F.3d 648, 660 (4th Cir. 2021). Similarly, plaintiffs' EMTALA claims against individual defendants must be dismissed for the further reason that it does not "permit[] an individual to bring a similar action against a treating physician." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 877 (4th Cir. 1992).

personally against defendants related to their handling of decedent's records, plaintiffs fail to state a claim upon which relief can be granted.

In sum, plaintiffs' EMTALA claim fails as a matter of law and must be dismissed.

## CONCLUSION

Based on the foregoing, defendants' motions to dismiss, (DE 104, 107, 109, 114), are GRANTED. Plaintiffs' claims are DISMISSED for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6). The clerk is DIRECTED to close this case.

SO ORDERED, this the 24th day of April, 2025.


LOUISE W. FLANAGAN
United States District Judge

24